**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAIJEEM GIBSON, | : | |
| **Plaintiff** | : | **No. 1:22-cv-00618** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| SCI COAL TOWNSHIP, MEDICAL | : | |
| DEPARTMENT, <u>et</u> <u>al.</u>, | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Currently before the Court is Defendants' motion for summary judgment. For the reasons stated below, the Court will grant the motion.

**I.      BACKGROUND**

**A.      Procedural Background**

Pro se Plaintiff Taijeem Gibson ("Gibson"), a convicted and sentenced state prisoner, commenced this action by filing a verified complaint, an application for leave to proceed <u>in forma</u> <u>pauperis</u> ("IFP Application") and a certified prisoner trust fund account statement, all of which the Clerk of Court docketed on April 28, 2022. (Doc. Nos. 1–3.) In the complaint, Gibson names as Defendants: (1) Pennsylvania State Correctional institution Coal Township ("SCI Coal Twp.")'s Medical Department ("Medical Dept."); (2) Lynette Rich ("Rich"), a "CHCA" in the Medical Dept.; (3) Thomas McGinley ("McGinley"), the Superintendent of SCI Coal Twp.; (4) Blanche Milo ("Milo"), a Medical Dept. supervisor; and (5) Brian Toms ("Toms"), the J-Unit Manager at SCI Coal Twp. <u>See</u> (Doc. No. 1 at 1–3). Gibson asserts claims against Defendants under 42 U.S.C. § 1983 for alleged violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, and he also asserts that Defendants violated Sections 13, 25, and 26 of the Pennsylvania Constitution. <u>See</u> (<u>id.</u> at 12).

These claims relate to events that allegedly occurred during Gibson's incarceration at SCI Coal Twp. from October 2021 through April 2022. See (id. at 4–10). Gibson seeks monetary damages and injunctive relief. See (id. at 13).

On May 3, 2022, the Court issued an Order granting the IFP Application and directing the Clerk of Court to serve a copy of the complaint and waiver of service forms on Defendants. (Doc. No. 6.) Defendants waived service (Doc. No. 9) and then filed a motion to partially dismiss the complaint along with a supporting brief on June 27, 2022 (Doc. Nos. 10, 11). Following receipt of an extension of time to file a response to the motion (Doc. Nos. 12, 13), Gibson filed a brief in opposition on July 27, 2022 (Doc. No. 14).

On March 7, 2023, the Court issued a Memorandum and Order on Defendants' motion to partially dismiss the complaint which resulted in, inter alia, (1) the dismissal with prejudice of Gibson's claims against the Medical Dept. and (2) only his Section 1983 claims for inadequate medical care in violation of the Eighth Amendment against McGinley, Rich, Milo, and Toms, as well as his claims for injunctive relief under Article I, Section 13 of the Pennsylvania Constitution, moving forward. See (Doc. Nos. 18, 19). The Court also directed Defendants McGinley, Rich, Milo, and Toms to file an answer to the complaint. See (Doc. No. 19 at 2). Defendants timely filed an answer with affirmative defenses to the complaint on March 28, 2023. (Doc. No. 22.)

In between the Court's resolution of the motion to partially dismiss the complaint and the filing of Defendants' answer, Gibson filed a motion for leave to add certain documents to his complaint along with a supporting brief. (Doc. Nos. 20, 21.) The Court granted this motion on April 13, 2023. (Doc. No. 23.) Gibson then timely filed his exhibits to attach to his complaint on May 1, 2023 (Doc. No. 26), as well as a response to Defendants' answer (Doc. No. 25).

This action then proceeded through discovery, after which Defendants filed the instant motion for summary judgment on December 15, 2023.  (Doc. No. 27.)  Five days later, Defendants filed a supporting brief and a statement of facts in support of their motion.  (Doc. Nos. 28, 29.)  After requesting and receiving an extension of time (Doc. Nos. 30, 31), Gibson timely filed an opposition brief as well as an answer to Defendants' statement of facts on January 31, 2024.  (Doc. Nos. 32, 33.)  Defendants then filed a reply brief in further support of their motion on February 14, 2024.  (Doc. No. 34.)

On May 5, 2025, this Court issued an Order directing the parties to submit supplemental briefing addressing whether Gibson fully exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  (Doc. No. 38.)  The parties timely complied with this Order.  (Doc. Nos. 39, 40, 42, 43.)  Defendants' motion for summary judgment is now ripe for disposition.

### B.    Factual Background[1]

#### 1.    Gibson's Factual Allegations[2]

Gibson filed a "Sick Call Request" to the Medical Dept. in October 2021, complaining about a lump in his left testicle that was causing him pain.  See (Doc. No. 1 ¶ 1).  Soon thereafter, "medical staff" saw Gibson and scheduled him for an ultrasound on October 19,

---

[1]  This factual background is comprised entirely of Gibson's allegations in his verified complaint (Doc. No. 1), and the documents he later attached to his complaint (Doc. No. 26).  Neither party introduces any other evidence for or against summary judgment in their summary judgment submissions.  See (Doc. Nos. 29, 33).

[2]  Along with Gibson's factual allegations, the Court will cite to Gibson's separately filed exhibits (except for his grievance-related documents) where needed to complete this summary of his factual allegations.

2021.[3]  See (id. ¶ 2).  Gibson was unable to attend this appointment because he was unvaccinated

for COVID-19 and, as such, needed to be escorted to the Medical Dept. by a corrections officer,

which, he alleges, was not provided for him.  See (id. ¶¶ 3; 13–17 (averring that SCI Coal

Township had a procedure pursuant to which unvaccinated inmates needed an escort to move

outside of their designated housing unit)); see also (Doc. No. 26 at 17–19 (declaring that "all

movement of unvaccinated inmates from J-Block was [only] to be allowed by an escort by a

Correctional Officer per [DOC] and SCI Coal [Twp.] policy for unvaccinated inmates")).

Gibson was subsequently scheduled for several appointments for ultrasounds from November

2021 through February 22, 2022, but he was unable to attend those appointments because a

correctional-officer escort was not provided to him.  See (Doc. No. 1 ¶ 4).

On March 8, 2022, Gibson was escorted to the Medical Dept. for an ultrasound.  See (id.

¶ 5).  However, upon Gibson's arrival at the Medical Dept., he was informed that the individual

who performs the ultrasounds was gone.  See (id.).  As a result, Gibson did not receive an

ultrasound that day, and he was returned to his cell.  See (id.).

Thereafter, Gibson filed "multiple Sick Call Requests" complaining of pain in his

testicles on March 13, 2022, and March 27, 2022.  See (id. ¶ 6).  Despite these requests, "no pain

medication or treatment was given" to him.  See (id.).

On March 22, 2022, Gibson was again escorted to the Medical Dept., at which time he

received an ultrasound of his testicles.  See (id. ¶ 7).  Gibson was told that he would have to wait

seven to ten days for the ultrasound results.  See (id.).  Gibson was later seen by "a PA from the

---

[3]  The complaint appears to contain a typographical error insofar as Gibson alleges that the
ultrasound was scheduled for "10-19-22."  See (id. ¶ 3).  The Court has construed this allegation
as referring to 2021 instead of 2022.

Medical Dept.,]" who allegedly explained to him that the lump in his testicle was either a cyst or cancer.  See (id. ¶ 8).

On April 13, 2022, Gibson visited the Medical Dept. and was provided with his ultrasound results.  See (id. ¶ 19; Doc. No. 26 at 11).[4]  Gibson was informed that he had "a cyst on [his] Epiditimis [sic] as well as fluid and calcified 'stones' in [his] left testicle."  See (Doc. No. 1 ¶ 19).[5]  Gibson asked the "P.A." if a medical procedure could remove the cyst, fluid, and calcified stones.  See (id. ¶ 20).  The P.A. told him that there was such a procedure "but the [Medical Dept. would] not authorize" it.  See (id.).  Gibson stated that he was in constant pain, and he was told to take Tylenol or Motrin.  See (id.); see also (id. ¶ 11 (alleging that he had been dealing with pain for over six (6) months and had not been "given anything to help deal with it"); ¶ 21 (alleging that he is "very uncomfortable and in pain[,] cannot sit properly without discomfort or pain, and the slightest movements when [he is] in pain causes [his] testicles to swell")).

Gibson avers that he filed complaints about his medical treatment through the grievance process at SCI Coal Twp. and even "spoke" to McGinley about his "medical situation[.]"[6]  See

---

[4]  The report from Gibson's ultrasound indicated impressions of: (1) "[a] 1.2 cm left epididymal cyst likely corresponding to patient's focal symptomatology"; (2) "[s]mall bilateral hydroceles with calcifications, [which] may represent scrotal pearls"; and (3) "[a] 0.4 cm right epididymal cyst."  See (Doc. No. 26 at 10).

[5]  The Progress Note for this visit (prepared by Brian Davis, PA) indicates that Gibson's "[u]ltrasound [w]as unremarkable except for 1.2 cm epididymal cyst on left [sic]."  See (Doc. No. 26 at 11).  It also indicates that Gibson was "educat[ed] and reassur[ed]," and the "benign nature of the [ultrasound] finding" was "explained" to him.  See (id.).

[6]  It is unclear from the complaint whether Gibson alleges that he communicated with McGinley through the administrative grievance process at SCI Coal Twp. or whether he verbally spoke with McGinley on a separate occasion outside of that process.  See (id. ¶ 23 (alleging that he "spoke to Superintendent McGinley about my medical situation, and I got responses through the [g]rievance procedure")).

(id. ¶¶ 9, 23). Gibson also "spoke" with Toms about the "escort situation" at SCI Coal Twp. and explained that he suffered from "more pain" because an escort was not provided for him on several occasions in which he had medical appointments scheduled. See (id. ¶ 24). Toms responded to Gibson by telling him that it "wasn't his problem." See (id.). When Gibson asked Toms "how it [wa]sn't his problem[,]" Toms instructed Gibson to go to his cell or he would be sent to the Restricted Housing Unit ("RHU"). See (id.).

In addition to his conversations with McGinley and Toms, Gibson "explained [his] situation] to Milo. See (id. ¶ 25). Milo told Gibson that his medical issue was "frivolous[.]" See (id. ¶ 25). Gibson also alleges that Milo's statement "was supported by . . . Rich through[out] the [DOC] [g]rievance process." See (id.).

Overall, Gibson asserts that "medical staff and prison officials intentionally delayed and denied [him] access to medical treatment," despite knowing that he had medical appointments and that there was a medical procedure that could eliminate his pain and suffering. See (id. ¶ 27; ¶ 29 (alleging that Medical Dept. and "[p]rison officials" knew of his need for medical treatment but intentionally refused to provide such treatment and also delayed such treatment based on a non-medical reason")). As such, in addition to his request for monetary damages, Gibson seeks injunctive relief in the form of medical treatment and procedures to address the cyst, fluid, and calcified stones in his testicles. See (id. at 13).

### 2. Gibson's Grievances

#### a. March 4, 2022 Grievance (Grievance No. 971040)

On March 4, 2022, Gibson completed Grievance No. 971040, which included the following statement:

> ON APPROX [sic] MONTH OF OCTOBER I PUT A SICK CALL SLIP IN
> REGARDING A "BALL" OR "LUMP" ON MY LEFT TESTICLE. I WAS SEEN

AND TOLD I WAS TO BE SCHEDULED FOR AN ULTRASOUND.  I WAS TOLD I HAD A PASS APPROX [sic] AROUND THE MONTH OF NOVEMBER-DECEMBER TO GO DOWN TO SEE THE PERSON CONDUCTING THE ULTRASOUND. I WASN'T TAKEN NOR WAS I GIVEN A REASON.  I WAS TOLD IT WAS A POSSIBILITY IT COULD BE CANCER. I TOLD MEDICAL I WAS IN PAIN.  NOTHING HAS BEEN DONE TO HELP ME. YET OTHER PEOPLE SEEN [SIC] THE PERSON CONDUCTING THE ULTRASOUNDS. THIS IS DISCRIMINATORY CONDUCT FOR WHATEVER REASON, AND I HAVE BEEN ENDURING PHYSICAL PAIN AND SUFFERING AS WELL AS MENTAL, [indiscernible] SERIOUS NATURE OF THE ISSUE. AS RELIEF I WOULD LIKE TO BE SEEN BY THE ULTRASOUND PERSON, AND I WOULD LIKE TO BE FINANCIALLY COMPENSATED IN THE AMOUNT OF ONE MILLION DOLLARS ($1,000,000.00) AND ANY FUTURE MEDICAL BILLS INCURRED AS A RESULT [indiscernible].

See (Doc. No. 26 at 1 (capitalization in original)).[7]  In the section of the grievance where Gibson is directed to "[l]ist actions taken and staff [he had] contacted[] before submitting this grievance," Gibson stated: "I HAVE SPOKEN TO MEDICAL AND WROTE THEM REQUEST SLIPS.  I EVEN PAID $5.00 FOR THE VISIT THAT WAS FRUITLESS." See (id. (capitalization in original)).

On March 8, 2022, SCI Coal Twp. Grievance Coordinator A. Wheary rejected Grievance No. 971040 because it "was not submitted within fifteen (15) working days after the events upon which [the] claims are based." See (id. at 2).  The next day, Gibson received notice of the rejection of his grievance and filed an Inmate Appeal to Facility Manager.  See (id. at 3).  Gibson included the following statement in his appeal:

I am appealing the Coordinators [sic] decision to "Reject" [sic] my Grievance [sic] based on the (15) working day rule, because this is an ongoing issue.  The issue is EVERYDAY [sic] im [sic] in pain due to the "lump" in my left testicle.  It is debilitating and my mental state is impared [sic] due to the pain and suffering.  I was told it could be cancer or a cyst.  The seriousness of the situation is present.  I

---

[7] Unfortunately, the copy of Gibson's grievance is lightly copied and, as such, very difficult to read.  To the extent the Court was unable to translate the written text, the Court indicated as such.

have been trying to handle this since October of 2021.  Twice I have been scheduled to be seen and for some reason I haven't been seen.  The latest being 3-8-22.  I walked all the way down to medical escorted by c/o Kenecht only to be turned back and escorted by c/o Hubble from the times of 10:00 am – 10:25 am.  Other people are being seen by medical for their issues.  I paid my $5.00!  Where is my treatment, my relief?  The seriousness of the situation cannot be ignored, put yourself in my shoes.  The mental and physical stress due to the Gross [sic] Negligence [sic] of this medical department is taking a toll.  To have to have Administration intervene in a medical issue regarding the sensitive nature of the issue is <u>humiliating</u>!  Yet the seriousness of the issue isn't enough to have the Coordinator agree that fault falls on the Medical Department?  My 15 working days start over EVERYDAY [sic] because EVERYDAY im [sic] in pain.  So my pain due to negligence isnt [sic] grievable then?  Its [sic] been almost 6 MONTHS!, [sic] for an issue this serious.  Please overturn and uphold my initial grievance.

See (id.).

On March 10, 2022, McGinley responded to Gibson's appeal and upheld the Grievance

Coordinator's rejection of Grievance No. 971040 based on its untimeliness.  See (id. at 4).  In

doing so, McGinley stated:

I have reviewed your appeal and the initial rejection by CSA Wheary and concur with her finding that your grievance does not meet the DC-ADM 804 guidelines, specific to timeliness.

Within your grievance, your [sic] relay that this medical issue has been an 'ongoing' [sic] issue, therefore, timeliness should not be a legitimate reason for rejection.  You also relay that you have been dealing with this alleged issue since October 2021.  This writer has reviewed your medical record and from November to present date, you have failed to submit a sick call slip that has been specific to this issue.  Your failure to address this alleged issue through the sick call process substantiates the initial level finding.

Based upon what is referenced above, the Facility Manager continues to support the initial reason listed for rejection.

See (id.).

Gibson filed an Appeal to Final Review with the DOC Secretary's Office of Inmate

Grievances & Appeals ("SOIGA"), which SOIGA received on or before March 31, 2022.  See (id.

at 5).  On March 31, 2022, SOIGA issued a notice to Gibson that it was referring his appeal.  See

(id.).  SOIGA's notice stated in pertinent part as follows:

> This serves to acknowledge receipt of your appeal to final review for the grievance noted above.  In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", this Office has reviewed the documents submitted; including your initial grievance, the grievance officer's response, your appeal to the facility manager, the facility manager's response, and the issues you raised to final review.  Upon completion of this review, it is the determination of this Office to solicit input from an appropriate Central Office Bureau relative to the issue(s) raised in your grievance.  Therefore, please be advised that the final review decision will be delayed pending review by the office to which it has been referred.  Upon completion of this review, however, a determination will be made and you will be provided with a final appeal decision in writing.

See (id.).  On June 30, 2022, SOIGA dismissed Gibson's appeal to final review, finding that the

Grievance Coordinator properly rejected Grievance No. 971040 because it "was not submitted

within fifteen (15) working days after the events upon which [the] claims are based. . . . Your

grievance was not timely."  See (id. at 6).

### b.      March 9, 2022 Grievance (Grievance No. 972645)

On March 9, 2022, Gibson filed another grievance, Grievance No. 972645.  See (id. at 7).

In this grievance, Gibson stated:

> On 3-8-22 AT APPROX. 10:00 A.M., I WAS ESCORTED DOWN TO MEDICAL DEPT. FROM J-BLOCK BY c/o KENECHT.  UPON ARRIVAL I WAS TOLD THE INDIVIDUAL THAT DOES THE ULTRASOUNDS HAD LEFT BY A c/o THAT WAS WORKING IN THE BUBBLE INSTEAD OF MEDICAL PERSONNEL.  I WAS ESCORTED BACK TO J BLOCK FROM MEDICAL BY c/o HUBBLE AT APPROX [sic] 10:25 A.M.  I WAS SCHEDULED FOR AN ULTRASOUND REGARDING A "LUMP" OR "BALL" GROWING IN MY LEFT TESTICLE THAT WAS (AND STILL IS) GIVING ME PAIN IN OCTOBER 2021.  I WAS TOLD IT COULD POSSIBLY BE EITHER CANCER OR A CYST.  AROUND THE MONTH OF NOVEMBER I HAD AN APPOINTMENT BUT WAS NOT SEEN BY MEDICAL.  NO REASON WAS GIVEN, AND AGAIN ON THE 8TH OF MARCH THIS YEAR I WAS APPOINTED [sic] BUT NOT SEEN.  I HAVE BEEN ENDURING CONSTANT PHYSICAL AND MENTAL PAIN AS A RESULT OF THE "LUMP" SINCE OCTOBER 2021.  GIVEN THE SERIOUSNESS [sic] NATURE OF THE ISSUE AND GROSS NEGLIGENCE INCURRED BY THE MED. DEPT. RELIEF I

9

> WANT IS ONE MILLION DOLLARS ($1,000,000.00); IMMEDIATE SCREENING FOR CANCER AND ANY FUTURE MEDICAL BILLS PAID BY THE MED. DEPT.

See (id. (capitalization in original)).  In the section of the grievance where Gibson is directed to "[l]ist actions taken and staff [he has] contacted[] before submitting this grievance," Gibson stated:  "I HAVE SPOKEN TO MEDICAL, WROTE [sic] REQUEST SLIPS AND PAID A $5.00 CO-FEE (FOR NOTHING) AS WELL AS FILE [sic] A DC-804 PART 1 (GRIEVANCE # 971040) WHICH WAS DENIED UNJUSTLY! [sic] BY FACILITATOR, A. WHEARY."  See (id. (capitalization in original)).

On April 8, 2022, Rich issued an Initial Review Response to this grievance.  See (id. at 8).  In her response, Rich stated as follows:

> I have reviewed your medical records.  You were seen in sick-call on 3/14/22 for complaints of a lump on your testicle.  It is noted that you were scheduled for an ultrasound for which you were a no show on 10/19/21, 1/25/22, 2/22/22, and 3/8/22. You failed to present on 11/16/21 due to quarantine and on 2/8/22 due to J block no movement.  An ultrasound of your scrotum was completed on 3/22/22 since submitting this grievance.  Please fill-out and submit a sick-call slip to have a provider go over the results with you.  Nonetheless, I can only surmise that you were not experiencing any problems, due to no sick-calls being filed between when you were seen in sick-call on 10/11/21 and up to and including the date of this grievance pertaining to this specific issue.
>
> Based on the above, this grievance is hereby denied and is deemed to be frivolous in nature.

See (id.).  Gibson acknowledges that he never filed an appeal to the Facility Manager from Rich's Initial Review Response.  See (Doc. No. 40 at 3 ("This Plaintiff chose not to pursue grievance No. 972645 throughout the appeal process because one (1) grievance is sufficient. This Plaintiff did not want to 'muddy the waters' regarding the issue, therefore Plaintiff chose to pursue grievance No. 971040.")).

10

### 3.      Gibson's Requests to Rich and Milo[8]

#### a.      March 29, 2022

On March 29, 2022, Gibson submitted an Inmate's Request to Staff directed to Milo.  See

(id. at 16).  Gibson identified his request as follows:

> I am writing you regarding the lump in my left testicle and the lack of care I am
> receiving for it.  I do not know if its [sic] cancerous but I do know that because of
> it my testicles swell up until im [sic] unable to sit or walk properly.  The pain is
> extreamley [sic] bad an [sic] I am asking you to help me figure out some options
> that may be available to me for the pain and swelling until my ultrasound.

See (id.).

#### b.      April 13, 2022

On April 13, 2022, Gibson submitted another Inmate's Request to Staff directed to Milo.

See (id. at 14).  In this request, Gibson requested the following:

> I am writing you regarding the Ultra-Sound [sic] results revealing a cyst, fluid[,]
> and calcified stones that aren't supposed to be there, as well as persistent swelling
> of my testicles.  I was told by Mr. Stewart Ackerman that he would not offer me
> medication for the swelling nor any medical procedure to get rid of the problem
> behind the pain and swelling, i.e. cyst, calcified stones[,] and fluid.  I was told by
> Mr. Ackerman to write you if I had an issue and request such treatment from you.
> If I do not agree with his lack of treatment, I am asking you to please help me to
> find a solution to this issue. i [sic] am in pain and I would like for you to schedule
> me for a follow-up appointment with an outside provider that way I can see about
> further treatment and please give me something for the pain and swelling.

See (id.).

---

[8]  Although the Court includes Gibson's requests to Rich and Milo here, it notes that he has not
produced any evidence that Rich or Milo received the requests.  As such, while Gibson can
represent that he submitted the requests and did not receive responses to them, it is not
reasonably inferable that Rich or Milo received them, and nothing in this Memorandum should
be construed as expressing a finding that the record shows that Rich and Milo received Gibson's
requests.

11

c.        **April 22, 2022**

On April 22, 2022, Gibson submitted an Inmate's Request to Staff directed to Rich.  See

(id. at 15).  In this request, Gibson stated his request as follows:

> I am writing you after receiving no reply from Blanche Milo concerning my issue
> addressed.  I have a cyst, calcified stones[,] and fluid in my testicles that swell them
> to the point I can't sit properly or walk properly.  I am asking you to PLEASE help
> me with this pain, and find a solution to the problem.  No one is answering or
> treating the issue.

See (id.).

## II.    LEGAL STANDARDS

### A.    Motions for Summary Judgment

The Court must render summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See

Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the

outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers,

Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See

Anderson, 477 U.S. at 257.  When determining whether there is a genuine dispute of material

fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.

See id. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in [their] favor.").

12

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings. When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "he must make a showing sufficient to establish the existence of every element essential to his case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co., 475 U.S. at 588 (citation omitted). In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor." See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the

statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." See L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties. See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed. Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'" See Anchorage Assoc. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

**B.      Section 1983**

Section 1983 is the statutory vehicle by which private citizens may seek redress for

violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.

This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which

"to vindicate violations of federal law committed by state actors."  See Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S.

273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).

**C.      Eighth Amendment Deliberate-Indifference-to-Serious-Medical-Needs
Claims**

To prove a constitutional claim based on the failure to provide medical treatment, a

prisoner-plaintiff must show that prison officials were deliberately indifferent to the prisoner-

plaintiff's serious medical needs.  See Farmer v. Brennan, 511 U.S. 825, 835 (1994).  A prison

official is not deliberately indifferent "unless the official knows of and disregards an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference."  See id. at 837.  "A medical need is serious, . . . if it is one that has been diagnosed by

15

a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted).  A serious medical need also exists where "failure to treat can be expected to lead to substantial and unnecessary suffering."  See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991).

A prisoner-plaintiff can prove deliberate indifference against a prison official "where the[y] (1) know[] of a prisoner's need for medical treatment but intentionally refuse[] to provide it; (2) delay[] necessary medical treatment based on a non-medical reason; or (3) prevent[] a prisoner from receiving needed or recommended medical treatment."  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (explaining that a prisoner-plaintiff can show deliberate indifference where prison official "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed" (internal citations and quotation marks omitted)).  A plaintiff's allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).

Additionally, "[i]f a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  See id. at 236; see also Carter v. Smith, 483 F. App'x 705, 708 (3d Cir. 2012) (unpublished) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff.").  Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are

16

mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference." See Spruill, 372 F.3d at 236.  Nonetheless,

> [e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, . . . though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.

See McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted).

### D.    Exhaustion of Administrative Remedies Under the PLRA

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions.  See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88).  "These

17

applicable procedural rules are supplied by the individual prisons." Id. (citations omitted); see also Spruill, 372 F.3d at 222 (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

Here, the applicable grievance policy is DC-ADM 804. See (Doc. No. 119-6 ¶ 2 ("DC-ADM 804 outlines the necessary three-step process of the grievance procedure.")); see also DC-ADM 804, available at https://www.cor.pa.gov/About%20Us/-Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf (last visited Mar. 9, 2026).[9] Under DC-ADM 804, the DOC requires every inmate in its custody to "have access to a formal procedure" through which the inmates can "seek resolution of problems or other issues of concern arising during the course of [their] confinement." See DC-ADM 804, Policy Statement, § 3. The DOC refers to its "formal procedure" as the "Inmate Grievance System," see (id.), and it is comprised of three (3) separate steps. See (id., Inmate Grievance System Procedures Manual, §§ 1–2). The first step requires the inmate to submit a written grievance to the Facility Grievance Coordinator or designee, usually the Superintendent's Assistant, within fifteen

---

[9] The Court takes judicial notice of the DOC's three-tiered inmate grievance procedure as set forth in DC-ADM 804, as it is publicly available on the DOC's website. See Vanderklok v. United States, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (taking judicial notice of Department of Homeland Security's administrative program because it "is publicly available on government websites"); Blair v. Carl, No. 24-cv-00211, 2024 WL 3850444, at *8 n.6 (M.D. Pa. Aug. 15, 2024) (taking judicial notice of DC-ADM 804.2 (citing Spruill, 372 F.3d at 232)).

working days after the event upon which the grievance is based.  See (id., Inmate Grievance System Procedures Manual at § 1.A.8).  For the second step, the inmate must appeal an initial review response/rejection to the Facility Manager or designee within fifteen working days from the date of the initial review response/rejection.  See (id. at § 2.A.1.a).  For the third step, if the inmate "is dissatisfied with the disposition of an appeal from the Facility Manager/designee," they must "submit an Inmate Appeal to Final Review" to SOIGA within fifteen working days of the date of the Facility Manager/designee's decision.  See (id. at § 2.B.1.b).

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims.  See Spruill, 372 F.3d at 230–32 (concluding that the PLRA's exhaustion requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures").  A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them.  See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)).  "Available means capable of use; at hand."  Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted).  "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'"  Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).  "Although the availability of administrative

19

remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." Small, 728 F.3d at 271.

The failure to exhaust available administrative remedies "is an affirmative defense under the PLRA." See Jones, 549 U.S. at 216.  As such, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." See Rinaldi, 904 F.3d at 268 (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)).  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them]." See id. (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA, i.e., to "return[] control of the inmate grievance process to prison administrators, encourag[e] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted); Jones, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").  It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone." See Rinaldi, 904 F.3d at 268 (citation and internal quotation marks omitted).

## III.   DISCUSSION

In their motion for summary judgment, Defendants argue that they are entitled to summary judgment on Gibson's Section 1983 Eighth Amendment claims because (1) he failed to

20

exhaust his administrative remedies as required by the PLRA, see (Doc. Nos. 39 at 7–11; 43 at 6–12),[10] and (2) he has not shown that they were deliberately indifferent to his serious medical needs.  See (Doc. Nos. 28 at 4–11; 34 at 1–5.)  Defendants also contend that the Court should either decline to exercise supplemental jurisdiction over Gibson's claims under Article I, Section 13 of the Pennsylvania Constitution, or grant them summary judgment because he is seeking an injunction directing them to remove the lump and allow him to undergo any other appropriate medical procedures and no medical provider has determined that the lump needs to be removed or that he requires any other medical procedure.  See (Doc. No. 28 at 10–11).  The Court will address each argument in turn.

---

[10] Defendants argue that Gibson's failure to exhaust warrants summary judgment on all claims, see (Doc. No. 39 at 1 ("Plaintiff failed to exhaust his administrative remedies for all remaining claims against Defendants . . . ." (emphasis added)); however, any such failure would impact only his Section 1983 claims and not his claims under the Pennsylvania Constitution.  More specifically, the PLRA's exhaustion requirement mandates that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a) (emphasis added).  In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions.  See Rinaldi, 904 F.3d at 265; see also Ross, 578 U.S. at 638 (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford, 548 U.S. at 85)); Jones, 549 U.S. at 211 (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth, 532 U.S. at 733–34 (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).  Thus, the Court construes Defendants' exhaustion arguments as applying to only Gibson's Section 1983 claims and not his state-law claims.

21

A.    **Gibson's Section 1983 Claims**

1.    **Failure to Exhaust**

a.    **Grievance No. 972645**

Gibson admits that he failed to fully exhaust Grievance No. 972645 insofar as he never filed an Appeal to the Facility Manager after receiving the denial of the grievance in Rich's Initial Review Response.  See (Doc. No. 40 at 3); see also (Doc. No. 43 at 6 (pointing out that Gibson admits that he did not appeal Grievance No. 972645 to final review)).  Gibson also does not argue that the administrative process was unavailable to him; instead, he "chose not to pursue [G]rievance No. 972645 throughout the appeal process because one . . . grievance [was] sufficient [, and he] . . . did not want to 'muddy the waters' regarding the issue."  See (Doc. No. 40 at 3). Therefore, to the extent that Gibson had to exhaust Grievance No. 972645 before filing his complaint in this case, he failed to do so.

b.    **Grievance No. 971040**

Defendants argue that Gibson did not exhaust his Section 1983 claims against them through Grievance No. 971040 because (1) he failed to submit it within fifteen working days of the events grieved, as SOIGA ultimately determined when upholding the rejection of this grievance on final review and (2) he failed to name or identify them within the grievance. See (Doc. Nos. 39 at 8–10; 43 at 7–12).  The Court concludes that Gibson failed to timely submit Grievance No. 971040 and, as such, has procedurally defaulted his Section 1983 claims against Defendants.  Moreover, even if the Court determined that Gibson timely submitted this grievance, his Section 1983 claims against (at least) Toms and McGinley are procedurally defaulted due to his failure to identify them in the grievance.

22

### i.    Timeliness

Defendants first contend that Gibson failed to exhaust his administrative remedies because he did not submit Grievance No. 971040 within the fifteen-working-day period set forth in DC-ADM 804. See (Doc. No. 39 at 9). They also point out that this grievance was initially rejected as untimely, and SOIGA ultimately affirmed the rejection as untimely on final review. See (id. at 10). As such, they assert that Gibson procedurally defaulted his claims that could have arisen from Grievance No. 971040. See (id. at 9, 10).

In response to Defendants' timeliness argument, Gibson contends that this Court already rejected this argument and deemed "[t]he circumstances surrounding [his] claims" as "an ongoing issue." See (Doc. No. 40 at 2). He also asserts that Grievance No. 971040 should be deemed timely under the continuing violations doctrine. See (id. at 2–3; Doc. No. 42 at 2–3). Gibson states that he had appointments "scheduled from the month of October [2021], and every month after up until March [2022]," as such, "the same events grieved" to have occurred from October until December 2021, "apply to the next three (3) months." See (Doc. No. 42 at 2). Overall, Gibson contends that SOIGA erred in affirming the rejection of Grievance No. 971040 as untimely, and he requests that this Court treat his grievance as timely. See (id. at 3).

Initially, the Court notes that although Gibson contends that the Court already rejected Defendants' argument that Grievance No. 971040 was untimely, he does not identify the Memorandum or Order which would support his contention. See (Doc. No. 40 at 2). As best the Court can discern, Gibson refers to a portion of the Court's March 7, 2023 Memorandum addressing Defendants' Rule 12(b)(6) motion to dismiss, in which the Court discussed Defendants' argument that Gibson failed to sufficiently allege their personal involvement in any Eighth Amendment violation through relying on their responses to his grievances and

administrative appeals.  See (Doc. No. 18 at 12–16).  In this Memorandum, the Court stated in

relevant part as follows:

> Generally speaking, the mere filing of a grievance is insufficient to impute the actual knowledge that is necessary to demonstrate a defendant's personal involvement in an asserted constitutional violation.  See Rode[v. Dellarciprete, 845 F.2d 1195, 1207–08 (1988)] (finding that the filing of a grievance with the Governor-defendant's office was insufficient to demonstrate that the Governor himself had personal knowledge of the alleged wrongdoing). In addition, grievances that complain of events that have already occurred and that are in the past are not sufficient to show that defendants who respond to such grievances were personally involved in the asserted constitutional violations.  See Robles v. Casey, No. 10-cv-02663, 2011 WL 398203, at *2 (M.D. Pa. Feb. 3, 2011) (concluding that plaintiff had not shown personal involvement where "plaintiff's grievance only reported violations that had occurred in the past").
>
> Under certain circumstances, however, a grievance may be sufficient to place a defendant on notice of continued wrongdoing and, thus, may show actual knowledge of and acquiescence in the events that form the basis of the plaintiff's asserted constitutional claims.  See, e.g., Sutton v. Rasheed, 323 F.3d 236, 249–50 (3d Cir. 2003), as amended (May 29, 2003) (finding that prisoner-plaintiffs had established the personal involvement of a defendant who had played an "active role" in the continued denial of plaintiffs having access to religious texts and basing this finding, in part, on the fact that the defendant had issued a written response denying a final-grievance-appeal letter from one of the plaintiffs, which requested access to such religious texts); Diaz v. Palakovich, 448 F. App'x 211, 215 (3d Cir. 2011) (unpublished) (vacating district court's grant of summary judgment where the district court had failed to consider grievances pertaining to a pattern of ongoing wrongful conduct, and explaining that a reasonable factfinder could find that (a) the defendants had knowledge of such wrongful conduct through the prisoner's grievances and (b) had acquiesced in such conduct by failing to address the ongoing pattern of wrongful conduct).
>
> Thus, on one hand, the Court agrees with Defendants' argument that merely responding to an inmate's grievance that complains of events that have already occurred does not constitute the knowledge and acquiescence that is necessary to show personal involvement.  On the other hand, the Court agrees with Plaintiff's apparent argument that responding to a grievance that complains of events that are ongoing and denying requested relief may constitute the knowledge and acquiescence that is necessary to show personal involvement.
>
> The difficulty here, however, is that Defendants' argument relies on documents that have not been specifically referenced in the complaint or attached to the complaint. Moreover, while the complaint asserts several allegations that Plaintiff had, essentially, informed Defendants McGinley, Milo, and Rich of his medical

24

complaints, those allegations are sparse and have not been meaningfully developed in the complaint.

That being said, the Court observes that, on a Rule 12(b)(6) motion to dismiss, the burden rests with Defendants to show that Plaintiff's complaint fails to state a claim upon which relief can granted. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (explaining that, "under Rule 12(b)(6)[,] the defendant has the burden of showing no claim has been stated"); Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980) (concluding that the district court had committed reversible error where it had "shifted to the plaintiffs the burden which properly was the Government's on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and deprived the plaintiffs of the procedural safeguards to which they were entitled"). Thus, under these circumstances, the Court finds that Defendants McGinley, Rich, and Milo have not shown that the complaint fails to state a claim upon which relief can be granted.

See (id. at 14–16).

As shown from this language from the March 7, 2023 Memorandum, the Court did not address whether Gibson timely submitted Grievance No. 971040. See (id.). To the extent that the Court expressed agreement with Gibson's "apparent argument that responding to a grievance that complains of events that are ongoing," it was solely in the context of addressing whether his allegations were sufficient to show Defendants' personal knowledge and did bear on the issue of timeliness of this grievance. Moreover, the Court did not conclude that Grievance No. 971040 involved ongoing events; instead, the Court's decision was limited to a finding that Defendants did not meet their burden to show that Gibson failed to plausibly plead their personal involvement in his complaint. Therefore, contrary to Gibson's contention in his opposition brief, see (Doc. No. 40 at 2), the timeliness issue raised by Defendants in their motion for summary judgment remains an open issue for decision.

As for the timeliness of Grievance No. 971040, the parties agree that the grievance coordinator rejected this grievance after determining that it was not filed within fifteen working days of the events grieved and that SOIGA upheld this rationale for rejecting the grievance on

25

final review. <u>See</u> (Doc. Nos. 39 at 4–5; 42 at 3). If Gibson failed to timely submit his grievance,

his Eighth Amendment claims against Defendants in this case are procedurally defaulted. <u>See</u>

<u>Watson v. Fisher</u>, 558 F. App'x 141, 144 (3d Cir. 2014) (unpublished) ("An untimely or

otherwise procedurally defective administrative grievance or appeal results in a procedural

default and does not satisfy the exhaustion requirement, thereby precluding an action in federal

court." (citing <u>Woodford</u>, 548 U.S. at 90–91)); <u>see also</u> <u>Woodford</u>, 548 U.S. at 90–91 ("Proper

exhaustion demands compliance with an agency's deadlines and other critical procedural rules

because no adjudicative system can function effectively without imposing some orderly structure

on the course of its proceedings."); <u>Wadlington v. Ferguson</u>, No. 18-cv-00793, 2019 WL

4221086, at *5 (M.D. Pa. Sept. 5, 2019) (concluding that defendants were entitled to summary

judgment where "it is undisputed that the grievance was untimely and was rejected at all levels

of review as 'untimely'"); <u>Payne v. Kabilko</u>, No. 17-cv-02063, 2018 WL 2771583, at *6 (M.D.

Pa. Apr. 17, 2018) ("An untimely administrative grievance does not satisfy the mandatory

exhaustion requirements of the PLRA."), <u>report and recommendation adopted</u>, 2018 WL

2771516 (M.D. Pa. June 8, 2018). If, however, Gibson's grievance was timely submitted, then it

is arguable that the grievance process was unavailable to him insofar as rejecting the grievance

as untimely prevented the DOC officials from reviewing its merits. <u>See</u> <u>Ornstein v. Warden</u>, No.

18-cv-02042, 2021 WL 4290180, at *4 (M.D. Pa. Sept. 21, 2021) ("[W]hen the prison dismissed

Plaintiff's grievance as untimely despite the clear language of the prison's policy showing that

the grievance was timely, the prison rendered subsequent stages of the grievance process

unavailable and Plaintiff was entitled to file suit in federal court at that moment."); <u>see also</u> <u>Ezell</u>

<u>v. Neibel</u>, 21-cv-01434, 2024 WL 4111769, at *5 (S.D. Ill. Aug. 19, 2024) (concluding that the

administrative process was rendered unavailable to an inmate when prison officials erroneously

26

determined that the inmate's grievance was untimely filed), report and recommendation adopted, 2024 WL 4104241 (S.D. Ill. Sept. 6, 2024).

Gibson disputes the DOC officials' determination that he untimely submitted Grievance No. 971040 because it concerned an ongoing condition or continuing violation, namely, the failure to take him for a scheduled ultrasound. See (Doc. No. 42 at 3).[11] The continuing-violations doctrine, which typically arises in the context of a statute-of-limitations bar, is an "equitable exception to the timely filing requirement," which permits a court to toll the statute of limitations if a defendant's conduct constitutes a "continuing violation." See Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)). This "equitable exception" applies "when a defendant's conduct is part of a continuing practice," and "an action is [deemed] timely so long as the last act evidencing the continuing practice falls within the limitations period . . . ." See id. (citations and quotation marks omitted).

As applied to a statute of limitations, the continuing-violations doctrine does not toll the statute of limitations based solely on "the occurrence of isolated or sporadic acts." See id. (citation and quotation marks omitted). As such, "[t]he Court must consider carefully the distinction between 'continuing violations' and 'discrete acts.'" See Anders v. Bucks County, No. 13-cv-05517, 2014 WL 1924114, at *4 (E.D. Pa. May 12, 2014) (quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006)). Each "discrete act" "starts a new clock for filing

---

[11] To the extent that Gibson argues that Grievance No. 971040 encompassed any other continuing issue, such as a failure to treat his testicles, he did not complain about a lack of medical treatment despite complaining about his pain. See (Doc. No. 26 at 1). Rather, his grievance focused on a failure to take him for his ultrasound, which is evidenced by his only request for relief relating to his medical care: A request to see "the ultrasound person." See (id. (cleaned up)).

27

charges alleging that act."  See Hunt v. Pa. Dep't of Corr., 289 F. App'x 507, 509 (3d Cir. 2008)

(unpublished) (citations and quotation marks omitted).  For example, the continuing-violations

doctrine does not apply to a Section 1983 deliberate-indifference claim merely because the

plaintiff continues to suffer pain from an initial failure to provide medical treatment.  See Hickox

v. County of Blair, 591 F. App'x 107, 110, 111 (3d Cir. 2014) (unpublished) (concluding that the

continuing-violation exception to limitations bar was inapplicable because it "refers to continual

unlawful acts [by the defendants], not continual ill effects from an original violation" (alteration

in original) (citations and quotation marks omitted)).  In the end, a court considers at least two

factors when determining "whether to apply the continuing violations doctrine: (1) whether the

violations were related in subject matter and (2) whether the acts were recurring."  See Alexis v.

Connors, No. 23-2502, 2024 WL 3534480, at *4 (3d Cir. July 25, 2024) (unpublished) (citing

Cowell, 263 F.3d at 292).[12]

---

[12]  In Cowell, the Third Circuit Court of Appeals indicated that a plaintiff seeking application of
the continued-violations doctrine must satisfy three factors:

> (1) subject matter—whether the violations constitute the same type of
> discrimination, tending to connect them in a continuing violation; (2) frequency—
> whether the acts are recurring or more in the nature of isolated incidents; and (3)
> degree of permanence—whether the act had a degree of permanence which should
> trigger the plaintiff's awareness of and duty to assert his/her rights and whether the
> consequences of the act would continue even in the absence of a continuing intent
> to discriminate.  The consideration of "degree of permanence" is the most important
> of the factors.

See 263 F.3d at 292 (internal citations omitted).  However, in a decision more than a decade
later, the Third Circuit concluded that "permanency is not required to establish a continuing
violation" following the United States Supreme Court's decision in Morgan in 2002.  See
Mandel v. M & Q Packaging Corp., 706 F.3d 157, 166 (3d Cir. 2013).

This Court could not locate a Third Circuit decision clarifying whether the continuing-violations
doctrine encompasses three factors as explained in Cowell or two factors as explained in Mandel.
Moreover, both Cowell and Mandel were binding panel decisions, and pursuant to "Third Circuit
precedent and internal operating procedure, a panel of the Third Circuit 'cannot overrule an

To date, neither the United States Supreme Court nor the Third Circuit has addressed whether the continuing violation doctrine applies to exhaustion under the PLRA.  See Alexis, 2024 WL 3534480, at *4 n.4 ("We have not yet had an occasion to determine whether the continuing violations doctrine applies to the PLRA exhaustion requirement."); see also Whitenight v. Elbel, No. 16-cv-00552, 2019 WL 7284251, at *4 (W.D. Pa. Dec. 27, 2019) ("[T]he Court, through its own research, has found no cases applying the continuing violations doctrine in the context of failure to exhaust administrative remedies.").[13]  "Other circuits, however, have applied the doctrine in the exhaustion context."  Alexis, 2024 WL 3534480, at *4 n.4 (citing Morgan v. Trierweiler, 67 F.4th 362, 369–70 (6th Cir. 2023)); see also Sheltra v. Christensen, 124 F.4th 1195, 1201, 1204–05 (9th Cir. 2024) (explaining that the Fifth, Sixth, Tenth, and Eleventh Circuit Courts of Appeals have applied the continuing-violations doctrine to

---

earlier binding panel decision; only the entire court sitting en banc can do so.'"  See Al Haj v. LSCI-Allenwood Warden, No. 24-cv-01193, 2025 WL 1115751, at *3 (M.D. Pa. Apr. 15, 2025) (citing Chester ex rel. N.L.R.B. v. Grane Healthcare Co., 666 F.3d 87, 94 (3d Cir. 2011) and Third Circuit I.O.P. 9.1)).  Thus, both Cowell and Mandel remain binding, and the Third Circuit has issued decisions after Mandel that follow it and Cowell by discussing that there are two or three applicable factors when analyzing whether the continuing-violations doctrine applied.  Compare Alexis, 2024 WL 3534480, at *4 (identifying two factors), with Beckett v. Pa. Dep't of Corr., 597 F. App'x 665, 667–68 (3d Cir. 2015) (unpublished) (identifying three factors).

[13]  It appears that the Third Circuit has never held that the continuing-violations doctrine applies to a Section 1983 Eighth Amendment claim for deliberate indifference to serious medical needs, and it further appears that the Third Circuit recognizes that no such decision exists to date.  See Anderson v. Price, No. 22-3058, 2023 WL 5814664, at *2 n.3 (3d Cir. Sept. 8, 2023) (unpublished) ("Assuming without deciding that the [continuing-violations] doctrine can apply to a continuing period of medical neglect, we will consider all of Anderson's factual allegations about the alleged period of neglect from 2012 through May 2018, the latter part of which falls within the limitations period."); see also Hunt, 289 F. App'x at 509 ("[N]either this Court nor the Supreme Court has ever applied the continuing[-]violation[s] doctrine outside of the employment discrimination context." (citing Morgan, 536 U.S. at 113 and O'Connor, 440 F.3d at 127–28)); Woodell v. Wenerowicz, No. 18-cv-01098, 2019 WL 4139264, at *10 (E.D. Pa. Aug. 30, 2019) ("To date, the Third Circuit has not applied [the continuing-violations doctrine] to an Eighth Amendment claim.").

29

PLRA administrative exhaustion and agreeing with those circuits that the doctrine applied to

administrative exhaustion under the PLRA) (citations omitted)).  The Ninth Circuit Court of

Appeals is one of the other courts of appeals to apply the continuing-violations doctrine to

administrative exhaustion under the PLRA, and has explained that "[t]here are two applications

of this doctrine":

> First, courts have applied the continuing-violations doctrine to extend filing deadlines under the reasoning that where a violation is ongoing, the limitations period begins anew each day the violation continues.  See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (when an "unlawful practice . . . continues into the limitations period," the limitations period restarts after each "asserted occurrence of that practice."). Second, courts have applied the continuing-violations doctrine in the context of exhaustion of administrative remedies under the PLRA to treat events occurring after an inmate's grievance as nonetheless exhausted when the later-occurring events are part of the single continuing harm or course of conduct that the inmate grieved.  See, e.g., Morgan, 67 F.4th at 369–70.

See Sheltra, 124 F.4th at 1201.

In this case, Gibson contends that the first application of the continuing-violations

doctrine, i.e., the deadline-extending application, renders Grievance No. 971040 timely.  See

(Doc. No. 40 at 2–3).  In other words, he argues that his filing of this grievance on March 4,

2022, effectively covers the preceding period when he was not taken for an ultrasound, i.e., from

October 19, 2021, until March 4, 2022.  Since this period included the fifteen-day period prior to

the filing of Grievance No. 971040, Gibson asserts that the DOC officials erred in concluding

that this grievance was untimely.[14]

---

[14]  It appears that when federal courts have applied the deadline-extending application of the continuing violations doctrine to PLRA exhaustion, they consider the prison's deadline for filing a grievance and then look back to any events which occurred during that period.  See Johnson v. Johnson, 385 F.3d 503, 519 (5th Cir. 2004) ("We agree with the defendants that Johnson has not exhausted any claims that arise from events that occurred more than fifteen days before this grievance."); Fulton v. Hakinberry, No. 14-cv-01459, 2015 WL 5098751, at *4 (W.D. Pa. Aug. 31, 2015) ("Because the DC–ADM 804 gives an inmate 15 days from the date of the event upon

For purposes of this analysis, the Court will assume without deciding that both the Supreme Court and the Third Circuit would hold that both applications of the continuing-violations doctrine are potentially applicable to PLRA administrative exhaustion. However, even with such a presumption, Gibson fails to show that the Court should apply it to this case. See Fusco v. Bucks County, No. 08-cv-02082, 2009 WL 4911938, at *7 (E.D. Pa. Dec. 18, 2009) (explaining that "[t]he plaintiff bears the burden of demonstrating that the continuing[-]violation[s] doctrine applies.").

In the first instance, the Court notes that this case does not involve allegations that a defendant was deliberately indifferent to a prisoner-plaintiff's serious medical needs by virtue of their affirmative act(s). Instead, Gibson's allegations relating to his ultrasound involve alleged failures to act. Such allegations create an issue for the deadline-extending application of the continuing-violations doctrine because it essentially excuses a prisoner from their own failure to act, i.e., their failure to timely file a grievance about an issue so that prison officials may address the issue. This differs from the later-occurring-event application of the continuing-violations doctrine because the prisoner-plaintiff has at least taken the action of filing a grievance about an issue, and the law essentially recognizes that the prisoner-plaintiff need not file a future grievance about an event which is "part of the single continuing harm or course of conduct that the inmate [previously] grieved." See Sheltra, 124 F.4th at 1201 (citing Morgan, 67 F.4th at 369–70). Although the Court recognizes that the rationale for the deadline-extending application

---

which his claims are based to file a grievance, Plaintiff's claims, insofar as they arise from conduct that occurred within the 15 days of the date he filed his grievance, have been exhausted." (citing Corbin v. Bickell, No. 13-cv-00856, 2014 WL 3590000, at *7 (M.D. Pa. July 21, 2014))); Corbin, 2014 WL 3590000, at *7 ("We agree with the Fifth Circuit's analysis in Johnson, and find that Plaintiff's claim of exposure to ETS was properly exhausted as to claims based on events fifteen days before the filing of his grievance on December 14, 2012.").

considers that the plaintiff's constitutional rights are being violated through the date of filing, it could allow a plaintiff to sit on their hands instead of taking action to try to remedy the issue in their grievance.  It appears that the Third Circuit recognized this possibility when it stated that "the continuing[-]violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims."  See Cowell, 263 F.3d at 295.

Here, there are no genuine issues of material fact relating to Gibson's actions between October 19, 2021, the first time he was scheduled for an ultrasound but not taken for it because he lacked a correctional-officer escort, and March 4, 2022, the date he filed Grievance No. 971040.  The record shows that Gibson did not raise the issue with prison officials at all.

As Defendants point out in their statement of undisputed material facts: "[Gibson] describes that he was in pain and discomfort while he awaited the ultrasound appointment, but he didn't file a sick call slip or grievance concerning the pain until March 2022."  See (Doc. No. 29 ¶ 8).  Gibson's response to Defendants' statement is telling:

> This Plaintiff finds this statement controversal [sic].  Plaintiff filed a sick call October 2021.  [See (Doc. No. 1 ¶ 1).]  This Plaintiff also filed a Declaration from Rachiem Godfrey (see Doc. No. 26 at 26–27), concerning pain and "discomfort."  In the initial sick call[,] Plaintiff complained of pain and swelling.

See (Doc. No. 33 ¶ 8).  Gibson misinterprets Defendants' statement as indicating that he never complained about the pain in his testicles and, consequently, points to his allegation that he submitted a sick call request in October 2021 and the declaration from Mr. Godfrey about the pain he experienced, to show that he was in pain from October 19, 2021, until March 4, 2022.  See (id. (citing Doc. No. 1 ¶ 1).  Gibson does not address Defendants' statement that he did not complain about the pain by filing a sick call request or grievance "while he awaited the ultrasound appointment," see (Doc. No. 29 ¶ 8), which clearly references the period after he

32

visited medical and had an ultrasound ordered until filing Grievance No. 971040 on March 4, 2022. Therefore, Gibson identifies no evidence in the record that would show that he acted diligently to bring the ultrasound issue to prison officials' attention during the period from October 19, 2021, until March 4, 2022.

Gibson's allegations in his complaint further illustrate his lack of diligence in this case. According to Gibson, he was scheduled for an ultrasound on October 19, 2021, November 3, 2021, November 16, 2021, January 25, 2022, February 8, 2022, and February 22, 2022, but due to the lack of a correctional-officer escort he was not transported for any of these appointments. See (Doc. No. 1 ¶ 4). Yet, he did not file Grievance No. 971040 until March 4, 2022. This was not a situation where the Medical Dept. informed Gibson that they would order an ultrasound only to have it never contact him about the ultrasound. Under those circumstances, perhaps it would be understandable why Gibson would wait to file a grievance because he would not have any information about whether he was scheduled for an ultrasound. Here, however, Gibson was scheduled for an ultrasound on several occasions but never transported to the ultrasound. Those events would have alerted a reasonable person to act by filing a sick call request or a grievance, and Gibson's failure to act under those circumstances further counsels against application of the continuing[-]violations doctrine to Grievance No. 971040. See King v. Twp. of E. Lampeter, 17 F. Supp. 2d 394, 416 (E.D. Pa. 1998) ("[I]f the prior events should have alerted a reasonable person to act at that time, the continuing violation theory will not overcome the relevant statute of limitations."), aff'd, 182 F.3d 903 (3d Cir. 1999). Accordingly, DOC officials properly determined that Grievance No. 971040 was untimely under DC-ADM 804 because Gibson did not file it "within 15 working days after the event upon which the claim is based," see DC-ADM 804 § 1.A.8, and Gibson's Section 1983 claims are procedurally defaulted. See Spruill, 372 F.3d

33

at 230–32 (explaining that a prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims).[15]

### ii.   Identifying Defendants

Assuming arguendo that the continuing-violations doctrine applied and rendered Grievance No. 971040 timely, the Court would still conclude that Toms and McGinley are entitled to summary judgment in their favor based on Gibson's failure to exhaust because he did not name or otherwise sufficiently identify them in this grievance.  The Court recognizes that "the PLRA itself does not have a 'name all defendants' requirement."  See Byrd v. Shannon, 715 F.3d 117, 127 (3d Cir. 2013) (quoting Jones, 549 U.S. at 217); see also Jones, 549 U.S. at 219 ("[E]xhaustion is not per se inadequate simply because an individual sued was not named in the grievance[].").  Nonetheless, "prisoners are required to complete the administrative review

---

[15]  As an aside, the Court notes that the way Gibson grieved the issue relating to his ultrasound provides additional support for the Court's conclusion.  In Grievance No. 971040, he identified only a single occasion, "around the month of November-December," when he was not transported for a scheduled ultrasound.  See (Doc. No. 26 at 1 (cleaned up)).  This event was well more than fifteen days prior to when Gibson filed Grievance No. 971040; however, Gibson could have, and probably should have, stated in the grievance what he alleges in his complaint, namely, that there were several occasions in which he was not transported for a scheduled ultrasound, with the last of those occasions occurring on February 22, 2022, which was within the fifteen-day period provided by DC-ADM 804.  See (Doc. No. 1 ¶ 4).

Following the March 8, 2022 incident where an escort transported Gibson for an ultrasound only to have the individual who was to perform the ultrasound leave before he arrived, Gibson filed Grievance No. 972645 on March 9, 2022, in which he referenced the March 8th incident.  See Doc. No. 26 at 7).  Notably, Rich, in her Initial Review Response to this grievance, did not deny it as untimely; rather, she addressed it on its merits and determined it was frivolous.  See (id. at 8).  Gibson then chose to file his complaint in this case instead of pursuing an appeal from Rich's decision in accordance with DC-ADM 804.  If Gibson had completed the administrative appellate process for Grievance No. 972645, he arguably would have exhausted his deliberate-indifference claims, at least in a general sense, unless there were other grounds to conclude that he procedurally defaulted some or all of his claims.

34

process in accordance with rules that are defined by the prison grievance process," see id. (citing Jones, 549 U.S. at 218), and DC-ADM 804 requires an inmate's grievance to include "a statement of the facts relevant to the claim" and to "identify individuals directly involved in the event(s)."  See DC-ADM 804, § 1.A.11.

Here, Grievance No. 971040 does not mention any Defendant by name.  See (Doc. No. 26 at 1).  Nevertheless, because "the primary purpose of a grievance is to alert prison officials to a problem, [and] not to provide personal notice to a particular official that [they] may be sued," see Williams v. Beard, 482 F.3d 637, 638, 640 (3d Cir. 2007) (quoting Jones, 549 U.S. at 219), courts have concluded that a prisoner-plaintiff sufficiently identified defendants in their grievance even though they did not specifically name the defendants in said grievance.  For instance, courts have determined that a plaintiff fully exhausted their claims even though they did not include a defendant's name in their grievance where the plaintiff provided the title of the unnamed prison official or a functional description of the prison official's job.  See id. (concluding that plaintiff's description of the "'2-10' staff of the cell block" to be sufficient identification of defendants for exhaustion purposes); Trainor v. Wellpath, No. 20-cv-00225, 2023 WL 2603196, at *15 (W.D. Pa. Mar. 22, 2023) ("[C]ourts in the Third Circuit have found that inmates may adequately identify individuals in a grievance without using their names."), aff'd, No. 23-1771, 2024 WL 1427635 (3d Cir. Apr. 3, 2024) (unpublished).  Such a finding is also dependent on the sufficiency of the other facts included in the grievance.  See Travillion v. Wetzel, 765 F. App'x 785, 789 (3d Cir. 2019) (unpublished) (pointing out that the plaintiff "specified the date, location, and relevant facts related to his claim, as is . . . required by DC-ADM 804 § 1(A)(11)" and concluding that if the district court found that plaintiff's identification of certain defendants as "RHU Staff and Unit Management" was sufficient for exhaustion

35

purposes, his identification of other defendants as "SCI-Rockview staff and/or administration"

was also sufficient to comply with the identification requirement of DC-ADM 804 § 1.A.11);

Perez v. Reno, No. 22-cv-01021, 2023 WL 6051258, at *2 (M.D. Pa. Sept. 15, 2023)

(determining that plaintiff's reference to "the 2-10 shift officer" was sufficient identification

where grievance also provided specific information about date, time, and actions of assault by

other inmate); see also Johnson, 385 F.3d at 523 (explaining that "a grievance can sufficiently

identify a person even if it does not provide an actual name; functional descriptions and the

like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice"

(citation omitted)).

Moreover, some district courts, such as the United States District Court for the Western

District of Pennsylvania, have found exhaustion even where a plaintiff names only a particular

department in the prison:

> grievances that identify specific prison departments have been held to satisfy exhaustion requirements as to an individual defendant when the context provided the prison with notice of the individual's involvement. See Gregory v. Santos, [No. 07-cv-00669,] 2010 WL 750047, at *5 (S.D. Ill. Jan. 19, 2010) (grievances naming the "medical department" sufficiently exhausted claim against the prison's medical director)[, report and recommendation adopted as modified, 2010 WL 750040 (S.D. Ill. Mar. 3, 2010)]; Austin v. Correctional Medical Services, Inc., [No. 07-cv-00616,] 2008 WL 4426342, at *5 (W.D. Mich., Sept. 26, 2008) (grievance against "the Medical Services Department" held "more than sufficient to put on notice any and all individuals and entities involved with providing health care to prisoners at MCF"); Downing v. Correction Medical Services Inc., [No. 06-cv-00232,] 2009 WL 511849, at *7 (W.D. Mich. Feb. 26, 2009) (naming some individuals plus all Bureau of Health Care personnel who had treated plaintiff over the last six months sufficed). Courts in this district have agreed that prisoners may substantially comply with administrative procedures when they bring grievances against particular prison departments rather than specific individuals within those departments. See[,] e.g., Young v. Good, [No. 04-cv-00407,] 2008 WL 4816474, at *4 (W.D. Pa. Nov. 4, 2008) (grievance identifying "food services" sufficiently identified food services supervisors later named as defendants); Chmiel v. Pa. Dep't of Corr., [No. 18-cv-01691,] 2020 WL 1332830, at *5 (W.D. Pa. Mar. 23, 2020) (denying motion to dismiss, noting material issues of fact on exhaustion grounds,

36

where plaintiff "nam[ed] only the 'Medical Department' and not individual physicians").

See Doe v. Pa. Dep't of Corr., No. 20-cv-00023, 2021 WL 1583556, at *21 (W.D. Pa. Feb. 19, 2021), report and recommendation adopted, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021).

In this case, the only portion of Grievance No. 971040 that constitutes Gibson's attempt to identify the individuals involved in the events is where he states that: (1) he was told that he would be scheduled for an ultrasound after he "was seen" in "approximately the month of October" about his complaint of "a 'ball' or 'lump' on [his] left testicle"; (2) he had a pass to see the individual conducting ultrasounds in "approximately around the month of November-December" but was not "taken [or] given a reason"; and (3) he communicated with "Medical" before filing the grievance. See (Doc. No. 26 at 1 (cleaned up)). Even if this Court followed the more expansive notion of the information a plaintiff must provide in a grievance to sufficiently identify a defendant in accordance with DC-ADM 804, § 1.A.11, the above information was insufficient to identify Toms or McGinley in Grievance No. 971040. Not only are Toms and McGinley's names not mentioned in the grievance, but there is no information provided in the grievance that would have placed the prison on notice that Gibson was complaining about events involving Toms or McGinley.[16] McGinley is the Superintendent of SCI Coal Twp., and Toms is a Unit Manager there. Neither are members of the prison's Medical Dept., so Gibson's statement about communicating with "Medical" is also insufficient to identify Toms and McGinley as individuals involved in the events mentioned in the grievance. Furthermore, Gibson does not mention the lack of a correctional-officer escort for his ultrasound appointment.

---

[16] As illustrated by the language of this provision, DC-ADM 804 requires the inmate to "include the date," but allows them more flexibility to identify the "approximate time." See id. It does not provide that inmates may include the "approximate" date in the grievance like Gibson did here.

As to this latter point, the Court recognizes that Gibson describes the escort situation at SCI Coal Twp. and explains how it allegedly negatively affected his attendance at scheduled ultrasound appointments during the relevant period in both his complaint and his summary judgment submissions.  See, e.g., (Doc. Nos. 1 ¶¶ 3–4, 10, 13–17; 32 at 4–5; 33 ¶¶ 3, 6).  In other words, Gibson provides Defendants and the Court with notice that he asserts that the lack of a correctional-officer escort caused him to miss scheduled ultrasound appointments and constitutes deliberate indifference to his serious medical needs.  However, when considering the sufficiency of the information in Gibson's grievance to determine whether he exhausted his claims in this case, the Court is limited to the information in said grievance, and Grievance No. 971040 did not alert prison officials that he was complaining about the lack of an escort.  Instead, he merely states that "I wasn't taken, nor was I given a reason."  See (Doc. 26 at 1)[17].  He provided this vague statement about missing his scheduled ultrasound despite, inter alia, several months passing between not being "taken" for the ultrasound and the filing of Grievance No 971040 on March 4, 2022, lacking an escort for other scheduled ultrasounds prior to when he filed his grievance, knowing he needed an escort to go for his ultrasounds, and knowing that Toms was his Unit Manager.

Overall, Grievance No. 971040 did not provide prison officials with notice that Gibson was complaining about lacking an escort, that the lack of an escort constituted deliberate indifference to his serious medical needs, or that the prison officials responsible for coordinating the escorts were deliberately indifferent to his serious medical needs by not arranging for those

---

[17]  Gibson also did not complain about the lack of an escort in his Appeal to Facility Manager. See (id. at 3).  In fact, in the only portion of his submission in which he provides details about what transpired, Gibson states that on March 8, 2022, which was after he filed Grievance No. 971040, he had a correctional officer escort him to get an ultrasound "only to be turned back." See (id.).

escorts so he could obtain an ultrasound.[18]  Therefore, through both his failure to mention them by name or job title, and his failure to alert prison officials that he was complaining about the lack of an escort, Gibson failed to sufficiently identify Toms and McGinley in Grievance No. 971040.

Gibson's failure to sufficiently identify Toms and McGinley in Grievance No. 971040 would generally result in a procedural default of his Section 1983 claims against them.  See Spruill, 372 F.3d at 234 (explaining that plaintiff's failure to name defendant in initial grievance, despite DC-ADM 804 requiring prisoners to identify "facts relevant to the claim," meant any claim against that defendant was procedurally defaulted unless otherwise excused); Byrd, 715 F.3d at 127 (concluding prisoner failed to exhaust by not naming defendant in grievance as required by DC-ADM 804).  However, courts have recognized several ways to excuse a procedural default due to a failure to sufficiently name a defendant in a grievance.

First, "an inmate's procedural default may be excused if the prison identifies the persons involved and 'they were fairly within the compass of the prisoner's grievance.'"  See Pressley v. Miller, No. 21-2826, 2022 WL 17414866, at *2 (3d Cir. Dec. 5, 2022) (unpublished) (quoting Spruill, 372 F.3d at 234)); see also Wood v. Detwiler, 782 F. App'x 103, 105 n.3 (3d Cir. 2019) (unpublished) (stating (in dicta) that plaintiff's failure to name defendants in his grievances was "not dispositive as to whether he properly administratively exhausted his claims" because defendants' identities were "known throughout the grievance procedure").  Second, a court can

---

[18]  The Court emphasizes that by reaching this conclusion, the Court is not stating that Gibson had to include the same level of detail in Grievance No. 971040 that he needed to include in his complaint to plead a plausible claim for relief.  Rather, the Court points out the differences between the information Gibson provided to prison officials in his grievance and the information alleged in his complaint in this case because his complaint specifies that his deliberate-indifference claim is based in part on the lack of an escort whereas Grievance No. 971040 does not.

excuse a procedural default if the prison's actions after receiving the grievance reveal knowledge of the individuals involved in the grievance despite plaintiff failing to specifically name them. See Diaz, 448 F. App'x at 217 (determining that any procedural default due to plaintiff's "failure to name individuals working in the SCI-Smithfield mailroom . . . was excused by SCI-Smithfield's Initial Review Response indicating that the grievance officer went 'to the Mailroom to discuss the issue with the mailroom staff'"); Primus v. Wetzel, No. 19-cv-01597, 2021 WL 4226018, at *2 n.15 (M.D. Pa. Sept. 16, 2021) (concluding that plaintiff's failure to specifically identify defendant in grievance was excused because plaintiff accused "Unit Staff" of failing to protect in grievance and grievance officer investigated this claim "by interviewing unit staff"); see also Wojnarowski v. Wetzel, No. 19-cv-00174, 2022 WL 2116707, at *6 (W.D. Pa. May 10, 2022) (finding that plaintiff's procedural default was not excused where prison system never identified defendants by name or acknowledge that they were within the scope of plaintiff's grievance at any point in grievance process through grievance's final review).  Third, if the prisoner-plaintiff has a "justifiable excuse" for the failure to identify a defendant, the court may excuse a procedural default.  See Williams v. Pa. Dep't of Corr., 146 F. App'x 554, 557 (3d Cir. 2005) (unpublished) (explaining that "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust [their] administrative remedies under the PLRA").  Finally, if a prison official acknowledges a problem through their response to the grievance, a procedural default may be excused.  See Robinson v. Johnson, 343 F. App'x 778, 782 (3d Cir. 2009) (unpublished) (determining that prison's grievance process excused plaintiff's procedural default for failure to name defendant in grievance due to superintendent's response to plaintiff's appeal to the facility manager in which the superintendent acknowledged that plaintiff was assaulted); Bell v. Ardery, No. 22-cv-02003,

40

2025 WL 1523003, at *6 (M.D. Pa. May 28, 2025) (excusing plaintiff's procedural default for failing to name defendant medical supervisor in their grievance because the supervisor "responded to [plaintiff's] initial grievance when it was on appeal, demonstrating that [their] grievance achieved the primary purpose of alerting [the supervisor] to the problem [they] faced").

As for Gibson's procedural defaults for failing to sufficiently name Defendants in Grievance No. 971040, he asserts that "the names of the Defendants responsible for the administration of treatment, scheduling[, etc.], where [sic] unknown to [him]. As a result of the lack of information known to [him, he] name[d the] SCI Coal [Twp.] Medical Dep[t.] in [the] grievance[]." See (Doc. No. 40 at 1). This assertion is wholly insufficient to excuse any procedural default relating to his claim against Toms. Gibson asserts that Toms was his Unit Manager, hardly a position for which Gibson would not know Toms's name, job description, physical appearance, or any other descriptions which would have permitted him to identify Toms in this grievance.

The Court recognizes that Gibson alleges in his complaint that he "spoke" with Toms "about the escort situation and that due to him not providing an opportunity to have [correctional officers] escort [him] to medical[, Gibson] was [experiencing] more pain." See (Doc. No. 1 ¶ 24). Toms allegedly responded by stating that it "[was not] his problem." See (id.). When Gibson inquired why it was not Toms's problem, Toms allegedly told Gibson "to go lock into [his] cell or go to the [RHU]." See (id.).

Although it is unclear from the complaint when Gibson's alleged conversation with Toms occurred, and Gibson does not cite to any other evidence in the record showing when this conversation occurred, it does not support his assertion that after over a period of more than four

41

months, he was unable to identify Toms in this grievance. As such, Gibson has not identified a justifiable excuse for failing to name or otherwise identify Toms in Grievance No. 971040. Moreover, there is no alternative ground upon which to excuse Gibson's procedural default regarding Toms because (1) Toms is not a member of the Medical Dept., (2) prison officials did not mention Toms or otherwise acknowledge his involvement in response to Gibson's grievance or administrative appeals, and (3) Toms was not one of the officials who responded to Gibson's grievance or administrative appeals. This also was not a situation where Gibson did not know or have a belief as to whether Toms had control over the availability of escorts for him to attend an ultrasound because, as indicated above, Gibson allegedly confronted Toms about the lack of available escorts at some point in time before filing his complaint in this case. See (Doc. No. 1 ¶ 24). Accordingly, there is no basis upon which to excuse Gibson's procedural default regarding his claim against Toms.

As for McGinley, most of the same reasons for not excusing Gibson's procedural default relating to his Section 1983 claim against Toms apply to McGinley as well. For instance, McGinley, as the SCI Coal Twp. Superintendent, is not a member of the Medical Dept. McGinley also was not fairly within the scope of Gibson's grievance, and no prison official mentioned McGinley or acknowledged his involvement in response to Gibson's grievance or any administrative appeals. Furthermore, Gibson has not asserted a justifiable excuse for not knowing McGinley's name or job position, since McGinley was the Superintendent of the prison. However, unlike Toms, McGinley was one of the officials who responded to Gibson's grievance, through McGinley's Facility Manager Appeal Response. See (Doc. No. 26 at 4). As such, the Court will address whether this Response excuses Gibson's procedural default.

42

Through McGinley's response, he did not acknowledge that Gibson identified an issue; instead, he addressed only the timeliness of Grievance No. 971040 and affirmed the initial response determination that it was untimely.  See (id.).  This differentiates McGinley's action from the Third Circuit's decision in Robinson, because the DOC superintendent defendant in that case denied the plaintiff's Appeal to Facility Manager by indicating: "It is unfortunate that this assault happened to you at SCI-Pittsburgh, but RHU yard procedures have been modified to prevent something like this from happening again."  See 343 F. App'x at 781.  The Third Circuit determined that this statement showed that the grievance "evidenc[ed] knowledge on the part of prison officials . . . that there was a problem."  See (id. (omission in original) (quoting Williams, 482 F.3d at 640)).

The Court concludes that McGinley's Facility Manager's Appeal Response is insufficient to excuse Gibson's failure to name him in Grievance No. 971040.  The Court bases this conclusion not only on the fact that McGinley did not acknowledge any problem in his Response but because excusing Gibson's default in this instance creates a significant issue for exhaustion purposes under DC-ADM 804.  It would require a district court to excuse a plaintiff's procedural default for failing to name or otherwise identify a superintendent in their grievance merely because the superintendent responded to the plaintiff's initial level appeal.  It does not appear that the Third Circuit in Robinson, even though it was an unpublished decision, intended to extend a court's ability to excuse a procedural default this far.[19]  If a procedural default is

---

[19]  Robinson also addressed a prior version of DC-ADM 804, which provided in pertinent part as follows:

> "The inmate shall include a statement of the facts relevant to the claim. . . .  The inmate should identify any persons who may have information that could be helpful in resolving the grievance.  The inmate should also include information on attempts to resolve the matter informally.  The inmate may also specifically state any claims

excused in the circumstances presented here, there appear to be no instances under which a prisoner-plaintiff can procedurally default their Section 1983 claim against a superintendent without the district court excusing their default. If the prisoner-plaintiff names or sufficiently identifies the superintendent in the grievance and pursues the grievance through final review, the prisoner-plaintiff will have exhausted their claim against the superintendent unless another reason exists to determine otherwise. On the other hand, if the prisoner-plaintiff does not name or identify the superintendent in their grievance, but the superintendent denies the first level appeal, then any procedural default for a failure to name would be excused. At that point, courts might as well just exclude a superintendent from the individuals a prisoner must identify in their grievance to comply with DC-ADM 804 § 1.11.b. and exhaust their claims against the superintendent under the PLRA. Overall, Gibson failed to name McGinley in Grievance No. 971040 as required by DC-ADM 804. See DC-ADM 804 § 1.11.b (providing that "[t]he inmate shall identify individuals directly involved in the event(s)"), and the Court concludes that Gibson has procedurally defaulted his Section 1983 claim against McGinley to the extent that it is based on Grievance No. 971040, and there is no proper basis upon which this Court can exclude Gibson's default.[20]

---

        he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law."

See 343 F. App'x at 781 (omission in original).

[20] As for Gibson's claims against Rich and Milo, even if they were "fairly within the compass of" Grievance No. 971040, see Pressley, 2022 WL 17414866, at *2 (quoting Spruill, 372 F.3d at 234), insofar as he complained about the Medical Dept., no prison official identified them in their responses to the grievance or Gibson's administrative appeals. Additionally, the record does not show any actions by prison officials after receiving Grievance No. 971040 that would show they knew that Rich and Milo were involved in the events described in the grievance. Moreover, neither Rich nor Milo responded to Grievance No. 971040 or any administrative appeals. As such, the only basis to possibly excuse Gibson's procedural default is if he had a

### 2.     The Merits of Gibson's Deliberate-Indifference-to-Serious-Medical-Needs Claims Against Rich and Milo

Assuming <u>arguendo</u> that Gibson's Eighth Amendment claims against Rich and Milo are not procedurally defaulted, the Court concludes that there are no genuine issues of material fact that would preclude summary judgment on these claims. Preliminarily, the Court notes that Gibson alleges that Rich and Milo are supervisory officials at SCI Coal Twp. <u>See</u> (Doc. No. 1 at 2–3 (averring job titles)). Therefore, the evidence in the record must satisfy one of two theories of supervisory liability: first, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and second, "a supervisor may be personally liable under § 1983 if [they] participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations." <u>See</u> <u>A.M. ex rel. J.M.K. v. Luzerne County Juv. Det. Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); <u>Barkes v. First Corr. Med., Inc.</u>, 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim and describing "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates"), <u>rev'd</u> <u>on other grounds sub nom.</u>, <u>Taylor v. Barkes</u>, 575 U.S. 822 (2015).

---

"justifiable excuse" for his failure to name them in Grievance No. 971040. <u>See</u> <u>Williams</u>, 146 F. App'x at 557.

Although Gibson's lack of knowledge of the name of the staff member who saw him in October 2021 is not a justifiable excuse, Gibson's lack of knowledge as to who in the Medical Dept. had the responsibility for scheduling and ensuring he receive an ultrasound is justifiable. Gibson could have taken affirmative steps to identify the responsible party through an Inmate's Request to Staff but did not do so despite having over four months to gather information. Nevertheless, in the end, the Court finds that Gibson has set forth a justifiable excuse for not knowing that Rich and Milo's names, to the extent they were responsible for scheduling his ultrasounds.

To prove a supervisory liability claim under the first theory—the policy-and-practice strand of supervisory liability—a plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury.

See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).  For the second theory of supervisory liability—participating in, directing others to, or knowledge and acquiescence of constitutional violation—generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to prove personal involvement in an underlying constitutional violation.  See Saisi v. Murray, 822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of [their] position as the head of the [agency].'" (quoting Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005))); Zigler v. Warren, No. 21-cv-19474, 2022 WL 903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the unconstitutional conduct of [their] employees solely because [they are] a supervisor.").  Additionally, "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  See Chavarriaga, 806 F.3d at 222 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995) and Rode, 845 F.2d at 1201 n.6).

46

In this case, Gibson does not attempt to hold Rich and Milo liable under Section 1983 based on the first theory of supervisory liability, i.e., a policy or practice, because he has not identified any evidence showing that they maintained a policy, practice, or custom at SCI Coal Twp. that led to a violation of his constitutional rights. As such, the Court will address Gibson's claims against Rich and Milo under the second theory of supervisory liability, which requires Gibson to show that each Defendant participated in violating his rights, directed others to violate them, or knew of and acquiesced in their subordinates' violations.

### a.    Rich

Gibson's record evidence pertaining to his deliberate-indifference claim against Rich amounts to (1) her April 8, 2022 Initial Review Response to Grievance No. 972645, see (Doc No. 26 at 8), and (2) his Inmate's Request to Staff dated April 22, 2022, see (id. at 15). These documents are insufficient to create a triable issue of fact on Gibson's claim against Rich.

Preliminarily, the Court notes that to the extent Gibson is attempting to hold Rich liable for the lack of an escort for his ultrasound appointment from October 19, 2021, until March 8, 2022, he points to no evidence in the record showing that prior to Rich's April 8, 2022 Initial Review Response, she knew about his medical issues, played a role in ordering or scheduling the ultrasound appointment, or was responsible for coordinating with the "Unit Team" to arrange for correctional-officer escorts for unvaccinated inmates. In other words, there is no evidence showing that Rich was deliberately indifferent to Gibson's serious medical needs prior to April 8, 2022.

As for Rich's April 8, 2022 Initial Review Response to Grievance No. 972645, there is an initial issue about whether Gibson can assert any claim based on the events in this grievance because he admittedly did not exhaust it. It appears that the only way that Gibson could assert a

47

claim based on Rich's Initial Review Response (and his April 22, 2022 Inmate's Request to Staff) is by applying the later-occurring-event application of the continuing-violations doctrine, which would require this Court to determine that Grievance No. 971040 administratively exhausted Gibson's claims seeking relief for later-occurring events relating to the medical treatment for his testicles because they were part of the same continuing harm or course of conduct that he previously grieved. See Sheltra, 124 F.4th at 1201 (discussing the second application of the continuing-violations doctrine). However, this application requires that Gibson exhausted Grievance No. 971040, and the Court already determined that Gibson failed to properly exhaust this grievance. Thus, Gibson cannot assert any claims against Rich for events that followed from March 4, 2022.

Even if the Court presumed that the Supreme Court and the Third Circuit would recognize the second application of the continuing-violations doctrine to administrative exhaustion under the PLRA and Gibson fully exhausted Grievance No. 971040 as to his claim against Rich, there is no genuine issue of material fact about Rich's possible deliberate indifference to his serious medical needs. Rich's Initial Review Response noted Gibson's history relating to the pain and lump in his left testicle, including the scheduled ultrasound appointments, and she pointed out that Gibson had not submitted any sick calls from October 11, 2021, until the filing of Grievance No. 972645 on March 9, 2022. See (Doc. No. 26 at 8). Based on the lack of sick call requests, Rich concluded that Gibson's grievance was frivolous because he had not complained of any pain to the medical staff in months. See (id.). Rich also indicated that Gibson was seen at sick call on March 14, 2022, and he was awaiting the results from his ultrasound on March 22, 2022. See (id.). She further advised Gibson that he should submit a sick call request to have a medical provider go over the ultrasound results with him. See (id.).

48

Rich's Initial Review Response shows that she did not intentionally refuse to provide Gibson with medical treatment despite his need for it, delay any medical treatment for a non-medical reason, or prevent him from receiving needed or recommended medical treatment.  In addition, although Gibson asserted that he was in "constant physical and mental pain" due to the lump, he did not seek medication or any similar form of relief in Grievance No. 972645; rather, he sought money damages, a cancer screening, and to have the Medical Dept. pay any future bills.  See (id. at 7).  Thus, in terms of medical treatment, the only treatment Rich denied was a cancer screening, which does not demonstrate her deliberate indifference under the circumstances considering that Gibson recently had an ultrasound and was awaiting the results. Rich also did not tell Gibson that he could not file a sick call request if he was having any issues. Overall, Rich's Initial Review Response to Grievance No. 972645 does not show that she was deliberately indifferent to Gibson's serious medical needs.

As for Gibson's April 22, 2022 Inmate's Request to Staff, it cannot form the basis of any claim against Rich for essentially the same reasons the Court discussed pertaining to her April 8, 2022 Initial Review Response.  The continuing-violations doctrine is inapplicable here because Gibson did not exhaust any of his grievances.  Therefore, there is no triable issue concerning Rich's alleged deliberate indifference to Gibson's serious medical needs.  Accordingly, even if Gibson had exhausted his deliberate-indifference claim against Rich, the Court would still grant Defendants' motion for summary judgment on this claim.

### b.    Milo

Gibson's deliberate-indifference-to-serious-medical-needs claim against Milo is premised on two Inmate's Request to Staff he submitted for her review, one on March 29, 2022 (Doc. No. 26 at 16), and the other on April 13, 2022 (id. at 14).  In the former, Gibson complained about

49

pain in his left testicle, "the lack of care [he was] receiving," and his testicles "swell[ing] up until [he was] unable to sit or walk properly." See (id. at 16). He also "ask[ed Milo] to help [him] figure out some options that may be available to [him] for the pain and swelling" until he received his ultrasound results. See (id.). In the latter, Gibson mentioned that a member of the medical staff told him that he would not receive medication for the swelling or a "medical procedure to get rid of the problem" to address the cyst, fluid, and calcified stones the ultrasound results showed he had in his testicles. See (id. at 14). Gibson noted that the staff member informed him that if he "had an issue," he could raise it with Milo. See (id.). Gibson requested that Milo schedule him for a follow-up appointment with an outside provider so he can "see about further treatment," and asked for "something for the pain and swelling." See (id.).

As with Rich, these Inmate's Request to Staff submissions directed to Milo do not create a triable issue of fact as to whether she was deliberately indifferent to his serious medical needs, and the grounds for concluding that Rich is entitled to summary judgment on Rich's deliberate-indifference claim apply equally here.[21] Accordingly, the Court will also grant Defendants' motion for summary judgment as to Gibson's deliberate-indifference claims against Rich.

---

[21] Even if the continuing-violations doctrine applied and allowed Gibson to raise a claim relating to events after March 4, 2022, there is no evidence in the record showing that Milo knew about his medical condition, any complaints regarding his medical care, any request for help with his pain and swelling, and any request for a referral to an outside provider. Additionally, there is no evidence in the record that any medical professional determined that Gibson required medication for his pain and swelling in his testicles or that he needed a procedure to address the cyst, fluid, and calcified stones found in his ultrasound. As such, the record does not show that Milo knew about Gibson's need for medical treatment and intentionally refused to provide it, delayed necessary medical treatment for a non-medical reason, or prevented him from receiving needed or recommended medical treatment. Moreover, the record shows that Gibson merely disagreed with the treatment decision not to give him medication or refer him to a medical procedure to address his issues, which is insufficient to prove deliberate indifference to his serious medical needs. See Spruill, 372 F.3d at 235.

**B.    Gibson's Claims Under Article I, Section 13 of the Pennsylvania Constitution**

Gibson asserts that Defendants were deliberately indifferent to his serious medical needs in violation of Article I, Section 13 of the Pennsylvania Constitution, see (Doc. No. 1 at 12); see also (Doc. No. 19 ¶ 2 (determining that Gibson's only remaining state-law claims are under Article I, Section 13 of the Pennsylvania Constitution)), which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." See Pa. Const. art. I, § 13.  However, due to the Court's resolution of Gibson's Section 1983 claims, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over his claims under the Pennsylvania Constitution.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").  Here, the Court finds that consideration of "judicial economy, convenience, and fairness to the parties . . . provide[s] an affirmative justification" for retaining jurisdiction over Gibson's claims under the Pennsylvania Constitution.  Specifically, the Court concludes that the age of this case, as well as the overlapping nature of Gibson's Eighth Amendment claims with his claims under Article I, Section 13, provide sufficient justification for retaining jurisdiction over his claims under the Pennsylvania Constitution.

As for those claims, "it is well settled that '[t]he Pennsylvania prohibition against cruel and unusual punishment is coextensive with the Eighth and Fourteenth Amendment of the

51

United States Constitution.'"  See Banks v. Trotta, No. 20-cv-01438, 2022 WL 2932047, at *7 (M.D. Pa. Apr. 18, 2022) (quoting Commonwealth v. Bonner, 135 A.3d 592, 597 n.18 (Pa. Super. Ct. 2016)), report and recommendation adopted, 2022 WL 2918899 (M.D. Pa. July 25, 2022).  Thus, a district court's determination of a claim raised under the Eighth Amendment to the United States Constitution "would apply with equal force to any parallel claim brought under Article I, Section 13 of the Pennsylvania Constitution."  See id.

Here, the Court has determined that Defendants are entitled to summary judgment on Gibson's Eighth Amendment deliberate-indifference claims even if the Court considered them on their merits.  Accordingly, Defendants are also entitled to summary judgment on Gibson's claims under Article I, Section 13 of the Pennsylvania Constitution.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion for summary judgment as to Gibson's Section 1983 Eighth Amendment claims for deliberate indifference to his serious medical needs as well as his claims for violations of Article I, Section 13 of the Pennsylvania Constitution.  The Court will direct the Clerk of Court to enter judgment in favor of Defendants and against Gibson and close this case.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

52